**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Thanarat SUTTISWAD,
Defendant-Appellant.**

**No. 81–1645.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 16, 1982.

Decided Nov. 1, 1982.

Rehearing and Rehearing In Banc
Denied Jan. 21, 1983.

Barry Portman, Asst. Federal Public Defender, San Francisco, Cal., argued, for defendant-appellant; James F. Hewitt, Federal Public Defender, San Francisco, Cal., on brief.

Sandra L. Teters, San Francisco, Cal., argued, for plaintiff-appellee; William Farmer, Asst.U.S.Atty., San Francisco, Cal., on brief.

Before KILKENNY and HUG, Circuit Judges, and BROWN *, Senior District Judge.

WESLEY E. BROWN, Senior District Judge:

Defendant Suttiswad appeals from his conviction upon a two count indictment charging him with importation of heroin from Bangkok, Thailand, and possession of heroin, with intent to distribute, in violation of 21 U.S.C. § 952(a), and § 841(a)(1). Following guilty verdicts returned by a jury defendant was sentenced to two concurrent terms of five years, with a three year special parole term.

Defendant is a native of Thailand. Customs officers found 3.98 pounds of heroin concealed behind linings in his luggage during a search at San Francisco International Airport on July 11, 1981.

In this appeal, three issues are presented for review. Appellant contends that the District Court erred in failing to authorize expenditure of Criminal Justice Act funds for the services of a statistical expert for the purpose of showing that grand juries in the Northern District of California failed to include sufficient minority jurors. It is also urged that the criminal intent instructions, as given, were erroneous, and that the prosecutor committed plain error in referring to "highly incriminating evidence outside the record," during his closing argument.

The government's evidence may be summarized as follows: Special Agent Fiorentino of the Drug Enforcement Administration was on duty at the San Francisco International Airport on July 11, 1981, observing passengers arriving on the 8:30 a.m. flight from Tokyo. He noticed defendant was one of the last passengers to pick up his luggage from the conveyor belt. After looking at the agent several times, defendant claimed a large red suitcase and carried it to Customs, where it was briefly inspected and returned. At this time, in response to a question, defendant stated that he was in the hotel business—"most like a clerk." (III T. p. 85A)[1] His passport, which was introduced in evidence, listed his profession as "Merchant." (III T. 90).

Defendant then left the customs area and approached the TWA ticket counter, where he asked another Customs Agent, Connie J. Fenchel, about a plane to "L.A." Agent Fenchel asked Suttiswad to return to the

---

* The Honorable Wesley E. Brown, Senior United States District Judge for the District of Kansas, sitting by designation.

1. Vol. III, Reporter's Transcript.

Customs area. He was taken to a small search room, where $1,500.00 in traveler's checks, a passport, an airline ticket, and some cash were found on his person. The red suitcase was then thoroughly searched, after one of the customs agents noticed that its lid "seemed rather heavy for an empty suitcase." After the linings of the suitcase were ripped out, eight packages containing heroin were discovered, and defendant was arrested. After advice of rights, and questioning by agents,[1a] defendant denied all knowledge of the heroin, and gave the following story, as related by Agent Fiorentino: (III T. pp. 20–21).

> I asked Mr. Suttiswad where his trip began, what he was doing in the United States. I asked him what he was doing for a living. He began to tell me a story that he was a tour driver. He drove a taxi in Bangkok, Thailand, where he lived, and about one month prior to the situation that he was in, sometime in the beginning of June, 1981, he had been hired by an American male who he knew by the name of Tom to be driven around Bangkok and showed the sights and the clubs and so forth for about one week. He said he became friends with Tom. And Tom asked him if he would like to go to the United States.
>
> Mr. Suttiswad said he was poor. He had no money and would not be able to go to the United States.
>
> Tom told Mr. Suttiswad that would be no problem. He would give him the money to go. He would buy him a ticket. He would give him new clothing. He would give him spending cash. And he would give him a suitcase.
>
> Mr. Suttiswad said that he agreed to this. And some time later—I don't remember whether it was a few weeks or a few days—he said Mr. Tom, as he called him, gave him about ten thousand baht, which is Thai currency, to go purchase and make arrangements to get a Thai passport to travel.

> He said he got the passport. He then contacted Mr. Tom again, and Mr. Tom gave him enough money to buy an airline ticket to the United States and back, and also gave him $1,500 in spending cash and told him that he would be seeing him in Los Angeles in a few days.

\* \* \* \* \* \*

> I asked him if he had the last name or telephone number or address (of Mr. Tom). And he said he had none of these. All he knew him by was Mr. Tom, a forty-year-old white male with blondish hair, rather skinny. That was about it.

Suttiswad advised the agent that "Mr. Tom" would meet him at the Los Angeles Airport on July 11th, and although defendant had missed a plane connection in Tokyo and had had to stay there overnight, "Tom" was going to know he would be late—that "Tom would just know." At a later point in questioning, defendant indicated that he was supposed to contact "Mr. Tom" at the Cloud Motel in Los Angeles. A number for the Cloud Motel was listed in an address book carried by Suttiswad.

At the time of his arrest, defendant was carrying a letter from a tour company in Bangkok addressed to a California tour operator, advising that on July 11th Suttiswad would be joining a 15-day tour which was then in progress. Suttiswad did not tell the agents that he planned to join any American tour, and the California tour operator had received no information from Bangkok that he would be joining the tour group mentioned.

A government witness testified that although attempts were made to lift latent fingerprints from the surface of the plastic bags, no identifiable prints were found. No attempt was made to lift prints from the areas between the walls of the suitcase and the concealed heroin. The government presented evidence to the effect that the value of the heroin seized, after it had been cut down to saleable units of one gram each, was $5,000,000.

Suttiswad presented no evidence at trial.

---

1a. Suttiswad spoke and understood English well although a special interpreter was called in to fully advise him of his rights.

## Authorization of Funds

Under the Jury Selection and Service Act, as amended, 28 U.S.C. § 1861 et seq., a defendant may move to dismiss an indictment and stay proceedings upon the ground that there has been a substantial failure to comply with the Act in the selection of grand or petit jurors, and he is entitled to present records and any relevant evidence to support his claim. 28 U.S.C. § 1867(a), 1867(d). Suttiswad filed a motion to stay proceedings, grant discovery, and to dismiss the indictment upon the ground that the grand jury selection procedures in the district failed to comply with the Act and the 5th and 6th Amendments, in that grand jurors were not selected at random from a fair cross section of the community because the selection procedures unlawfully excluded racial and ethnic minorities.

Preliminary studies were made of grand jury records in the district by staff members of the Public Defender's Office, and this information was reviewed by a statistician, who concluded that racial disparities existed in the composition of past grand juries to a degree which indicated that some non-random selection process existed in the district. This data had been collected by the Public Defender at the request of The Honorable Marilyn H. Patel in the case of *United States v. Maria Valiao,* CR 81–0141 MHP, Northern District of California. (Ex. R. 131; R. 15)[2]

Suttiswad then sought funds ($16,000, "or any lesser amount") under the Criminal Justice Act, 18 U.S.C. § 3006A, to pay for expert assistance in compiling and analyzing statistical data. In support of this motion, two attorneys, experienced in criminal law, filed affidavits, stating that in their professional opinions, expert services would be obtained, "if the attorney had a client who had the independent means to pay for them ..." (R. 15). The government op-

posed the motion to dismiss upon the basis of Judge Patel's ruling in *United States v. Valiao,* supra, and on August 26, 1981, the motion was denied. (R. 18). In a further hearing before the Court on September 4th, and in open court, the Motion for Funds for expert assistance was denied upon the basis of Judge Patel's ruling: (II T. p. 4)

> The Court: I intend to deny that. My ruling would be based on the same grounds and considerations set forth in Judge Patel's ruling. I don't think we need to clutter up the record. I'll make cross-reference to that.

It is apparent that the Suttiswad motions were based upon identical data and virtually identical arguments as those presented to Judge Patel in *Valiao.* In overruling motions to dismiss and stay proceedings and motions for funds for expert assistance, Judge Patel found that any disparities which might exist in the District are approximately the same or smaller than those approved by this Circuit in *United States v. Kleifgen,* 557 F.2d 1293 (9 Cir. 1977), and substantially smaller than disparities considered insubstantial by other circuits.

The preliminary statistics presented by the Public Defender's Office, following review of 610 questionnaires returned by persons who served on grand juries in the Northern District between 1979 and August 1980, are summarized as follows:[3]

| | % on Grand Jury | % General Population, N.Dist. Calif., 1980 Census | Underrepresentation in Absolute Terms |
|---|---|---|---|
| Blacks | 6.5 | 9.3 | 2.8 |
| Spanish | 4.2 | 11.9 | 7.7 |
| Asians | 3.6 | 8.3 | 4.7 |

Assuming that such figures are correct, it does not appear that any discrepancy exceeds allowable limits under standards set out by this Circuit in *United States v. Kleifgen,* supra, and *United States v. Armstrong,* 621 F.2d 951 (9 Cir. 1980). See also,

---

2. Clerk's Record, p. 15 and Excerpts of Record 131.

3. Had there been an evidentiary hearing on defendant's claim for funds, it appears that the government would oppose these figures upon the ground that 1980 census figures were erro-

neously used. It is pointed out that the entire population of the Northern District would not be available for jury service, since age, citizenship, and language requirements must be considered.

*United States v. Yazzie,* 660 F.2d 422 (10 Cir. 1981), cert. den., 455 U.S. 923, 102 S.Ct. 1282, 71 L.Ed.2d 464 (1982). In *Kleifgen,* the defendant interpreted his statistics to show that Blacks and males were underrepresented on grand juries by 27% and 9% respectively, an interpretation which exaggerated the effect of the deviation. We there set out the more appropriate test in this manner at p. 1297 of 557 F.2d:

> To avoid this exaggeration, we adopted a test for substantiality which judges the effect of any deviation not in terms of percentages but in terms of its impact on the absolute numerical composition of the grand jury ... That is, to determine substantiality we look to *people* not *percentages.*

> Blacks and males, it is true, are underrepresented in an absolute sense by 2.9% and 4.4% respectively. Looking only at people, however, it is also true that in an array of 100 jurors, the absolute numerical effect of the underrepresentation of Blacks and males would be that the array would include 2.9 fewer Blacks and 4.4 fewer males. A grand jury of 23 drawn from this array on the average would underrepresent Blacks by less than one juror and males by approximately one juror. This is not substantial underrepresentation.

In *Armstrong,* supra, the proportion of Blacks on the grand jury panel was found to be 1.369% as compared to 4.2% Blacks in the general population of the district. The defense argued that Blacks were therefore underrepresented by 65.2% on the panel. Relying on *Kleifgen,* this court again relied on a test of substantiality based upon the absolute numerical composition of the grand jury, in terms of *people:*

> Accepting as correct the statistics of the defense, Blacks were underrepresented on the grand jury panel in absolute terms by 2.83%. A grand jury drawn from this panel would on the average underrepresent Blacks by less than one juror. The district court correctly concluded that this was not substantial underrepresentation under the standard set forth by our cases. (621 F.2d at 956).

Under the figures presented in the case before us, underrepresentation in absolute terms is 2.8% for Blacks, 7.7% for Spanish, and 4.7% for Asians. In a grand jury of 23 persons, this would translate to underrepresentation by less than one Black person (.644), 1.761 Spanish persons, and 1.081 Asian persons. Any disparity is similar to those previously approved by this Circuit in *Kleifgen* and may be considered insubstantial. Defendant suggests that this Court should "add up" all of the separate figures of minority underrepresentation in order to arrive at one figure for underrepresentation of "non-whites", who defendant asserts, comprise over 36% of the population in the Northern District of California. No authority is presented for the argument that "non-whites" should be recognized as a separate "ethnic group" for this purpose. In *Kleifgen* the appellant urged that "non-high school graduates, non-working people ... [and] the young" were also underrepresented in the jury selection process. 557 F.2d 1296. We noted that none of these constituted cognizable groups, which "in some objectively discernible and significant way" would be distinct from the rest of society. Any group which might casually be referred to as "non-whites" would have no internal cohesion, nor would it be viewed as an identifiable class by the general population. Certainly, the members of such group would have "diverse attitudes and characteristics which would defy classification." 557 F.2d at p. 1296.

Under these circumstances, we find no error in the refusal of the district court to authorize funds for the purpose of hiring an expert statistician to further analyze grand jury records. We believe, as we did in *Armstrong,* "that a reasonable attorney, after determining that there was no substantial disparity in ... representation ... on the grand jury panel, would not decide, necessarily, to incur the additional expense of retaining an expert statistician to analyze the master wheel." 621 F.2d at p. 956.

*The Jewell Instruction*

In *United States v. Jewell,* 532 F.2d 697 (9 Cir. 1976, *en banc*), cert. den. 426 U.S.

951, 96 S.Ct. 3173, 49 L.Ed.2d 1188, the evidence indicated that defendant Jewell, who had earlier declined to buy marijuana in Mexico from a stranger identified as "Ray", accepted Ray's offer of $100 to drive a car back across the border to Los Angeles. A search of the auto uncovered 110 pounds of marijuana worth $6,250, which had been concealed in a secret compartment between the trunk and rear seat. Jewell testified that he did not know that the marijuana was present. He told an agent that "he thought there was probably something wrong and something illegal in the vehicle, but that he checked it over. He looked in the glove box and under the front seat and in the trunk, prior to driving it. He didn't find anything, and, therefore, he assumed that the people at the border wouldn't find anything either." 532 F.2d at 699, n.2.

In addition to general instructions on intent, the district court in *Jewell* gave the following additional instruction on deliberate ignorance: 532 F.2d at 700

> The Government can complete their burden of proof by proving, beyond a reasonable doubt, that if the defendant was not actually aware that there was marijuana in the vehicle he was driving when he entered the United States his ignorance in that regard was solely and entirely a result of his having made a conscious purpose to disregard the nature of that which was in the vehicle, with a conscious purpose to avoid learning the truth.

This Circuit affirmed the conviction and approved the use of a "deliberate ignorance" instruction in *Jewell,* although suggestions were made for more appropriate language to be used in such an instruction:

> We do not suggest that the instruction given in this case was a model in all respects. The jury should have been instructed more directly (1) that the required knowledge is established if the accused is aware of a high probability of the existence of the fact in question, (2) unless he actually believes it does not exist. (F.n. 21, p. 704, 532 F.2d.)

The full text of the trial court's instructions concerning knowledge and intent in the case now before us are as follows: (III T. pp. 156–157).

> Now, I want to talk to you about the knowledge and intent element in both of these offenses that are charged, both counts. The crimes charged in this case are serious crimes which require proof of specific intent before the defendant can be convicted. Specific intent, as the term implies, means more than the general intent to commit an act. To establish specific intent the government must prove that the defendant knowingly did the act which the law forbids purposefully intending to violate the law.

> An act or failure to act is knowingly done if it is done voluntarily and intentionally and not because of mistake or accident or other innocent reason.

> Now, since you can't look inside a defendant's mind to ascertain his intent, you must infer intent, or the lack of intent, from the defendant's acts and words at the time of the alleged commission of the offense, as well as before and after and from all the surrounding facts and circumstances shown by the evidence.

> Now, in that connection the element of knowledge may be satisfied by inferences drawn from proof that a defendant deliberately closed his eyes to what otherwise would have been obvious to him. A finding beyond a reasonable doubt of a conscious purpose to avoid enlightment would permit an inference of knowledge.

> Put another way, a defendant's knowledge of a fact may be inferred from willful blindness to the existence of the fact. It is entirely up to you whether you find any deliberate closing of the eyes and the inferences to be drawn from any such evidence.

> A showing of negligence or mistake alone is not sufficient to support a finding of willfullness or knowledge. If you find that the defendant believed that what was in the suitcase was not a controlled substance, then you must acquit.

On this appeal, defendant contends that the trial court's jury instruction concerning

deliberate ignorance was reversible error, because a "*Jewell* instruction" was inappropriate under the facts of the case, and because the instruction, as given, failed to include a requirement that the defendant be aware of the "high probability" that he was carrying contraband into the United States.

■ Under our ruling in *United States v. Murrieta-Bejarano*, 552 F.2d 1323, 1325 (9 Cir. 1977), a *Jewell* instruction is properly given only when a defendant claims a lack of guilty knowledge, and there are facts which point in the direction of deliberate ignorance:

> The *Jewell* instruction should not be given in every case where a defendant claims a lack of knowledge, but only in those comparatively rare cases where, in addition, there are facts that point in the direction of deliberate ignorance. (552 F.2d at 1325).

In *Murrieta-Bejarano*, the truck, carrying contraband from Mexico, belonged to defendant's employer. He had been instructed to drive to a gas station in Tucson to meet his employer's cousin. The cousin was to drop off defendant at a nearby poultry farm to visit his uncle. The uncle had in fact left this farm a year before. After the visit, the cousin was to return with the truck and a refrigerator which defendant was then to take back to his employer in Mexico. He earned about $8.00 per day, but he was carrying over $100, which he said was to be used to bribe Mexican customs officials. He never inquired about the source of the refrigerator or any other reason for the trip. He and his employer had made a similar refrigerator trip two weeks before. Having lived near the border all of his life, defendant was aware of the drug traffic between Mexico and the United States. He showed no surprise when marijuana was found in the truck.

■ Under the facts presented in Suttiswad's case, the *Jewell* instruction was properly given. If the "Mr. Tom" story was true,[4] then the circumstances surrounding Suttiswad's trip to the United States sufficiently point to deliberate ignorance which would justify such an instruction. If a relative stranger, of short acquaintance, gave Suttiswad an airplane ticket, clothing, a substantial amount of cash, gifts for his family, *and a suitcase*, which was perfumed, and seemed to be unusually heavy,[5]—and if Suttiswad was expected to travel to the United States and meet "Mr. Tom" without ever knowing his last name, his address, or phone number, the jury could properly infer that defendant deliberately closed his eyes to what otherwise would have been obvious to him.

Defendant next contends that the "deliberate ignorance" instruction, as given by the trial court, was insufficient and erroneous because it did not include a requirement that the jury must find beyond a reasonable doubt that the defendant was aware of a "high probability" that his luggage contained the contraband, as is required by our holding in *United States v. Valle-Valdez*, 554 F.2d 911 (9 Cir. 1977).

The *Valle-Valdez* case was tried before our opinion in *Jewell*. The defendant there testified that in a bar in Mexico he was offered $100 to drive a car from Calexico to San Diego. He picked up the car in a parking lot in Mexico (the keys were in an ashtray), and on arrival in San Diego, he was to park the auto at the bus depot, and

---

4. The question of whether defendant was, or was not, an unknowing "mule" was a subject given much attention during closing argument. In determining the truth of defendant's story, the jury would be entitled to consider defendant's background, the inherent improbability of the "Mr. Tom" story, defendant's actions at the airport before he claimed his bag, his conflicting stories about where he was to meet "Mr. Tom", the various descriptions he gave of his occupation, the suspicious nature of his possession of the 15-day tour letter which conflicted with his story that he came to visit "Mr. Tom", and finally, whether or not an unknowing "mule" would have been entrusted with heroin of the value of $5,000,000.

5. The suitcase was perfumed. Vol. IV, Transcript, p. 191. Whether or not it was "heavily perfumed" as the government contends, we can not say. The suitcase was an exhibit, and was available for inspection and evaluation by the jury.

leave the keys in the ashtray. When the car was stopped, 302 kilo bricks of marijuana were discovered in the trunk, the odor of marijuana permeated the passenger compartment, and it was found that the vehicle swayed and was difficult to control, due, in part, to the weight in the rear. The defendant testified that he was completely unaware that the vehicle contained marijuana and did not even suspect that that was the case. The instruction given in *Valle-Valdez* was as follows:

> The government has the burden of proving beyond a reasonable doubt that the Defendant had actual knowledge that marijuana was contained in the vehicle. *It can meet that burden by proving beyond a reasonable doubt that the Defendant acted with a conscious purpose to avoid learning the truth of the contents of the vehicle.* 554 F.2d at 913.

In *Valle-Valdez*, this Circuit found the above instruction to be deficient because "a factual issue arose regarding (defendant's) awareness of the high probability of the contraband's presence." 554 F.2d at p. 914. It was felt that the effect of the instruction "was to keep the question from the jury and to create the possibility that Valle-Valdez was convicted for violating section 841(a)(1) even though he did not possess contraband 'knowingly', as that word has been interpreted by us in *Jewell.*" 554 F.2d at 914.

In *Jewell*, as noted, the instruction was found sufficient, even though it did not require "an awareness of a high probability that the controlled substance was present." It was pointed out that: (F.n. 21, 532 F.2d at 704)

> The instruction given (that '(appellant's) ignorance in that regard was solely and entirely the result of his having made a conscious purpose to disregard the nature of that which was in the vehicle') suggests that the accused must be aware of facts making the presence of the contraband all but certain. Only if the accused were aware of such facts could his ignorance of the presence of the marihuana

be '*solely and entirely*' the result of his conscious purpose to avoid the truth. Under this instruction, neither reckless disregard nor suspicion followed by failure to make full inquiry would be enough.

■ While the instructions given in the case before us do not use the term "a high probability of contraband", taken as a whole, they did require the jury to find that defendant had a subjective awareness of this fact. The jury was specifically instructed that "negligence or mistake alone is not sufficient to support a finding of willfulness or knowledge." The jury was required to find that defendant "deliberately closed his eyes to what otherwise would have been obvious to him." The jury was also instructed that it must acquit Suttiswad if it found that he believed he was not carrying a controlled substance. One cannot willfully and deliberately avoid knowledge, or deliberately close his eyes, without an awareness of "a high probability of contraband." Under the circumstances present in this case, and considering the instructions as a whole, we find no error.

### Prosecutor's Argument

■ Defendant contends that in closing arguments the prosecutor committed plain error by referring to highly incriminating evidence which was outside the record.[6] This issue arises from the following circumstances:

In cross-examining the agent, defendant established that whoever had hidden the contraband in the suitcase must have handled the false linings, but no effort had been made by the government to find latent fingerprints on the surface of these walls. During closing arguments, defense counsel argued that this was a "major investigative failure," pointing out that such evidence would have been presented had it been incriminating. In rebuttal argument, the prosecutor made this statement:

> If we had fingerprints, we might have more defendants in here. Maybe we

---

**6.** Defendant failed to object to this reference.

have the defendant's fingerprints, but that's not part of what you should consider. Consider that a diversion.

Defendant contends that the clear implication of this argument is that the government did have the defendant's fingerprints, but considered that evidence a "diversion," and so refrained from producing them at trial.

It is clear that the prosecutor's comment was only fair rebuttal to counsel's argument concerning missing fingerprints, and we find no sinister connotation in these remarks. In any event, the prosecutor's comments do not rise to a level of "plain error," causing such prejudice to defendant that a reversal and new trial is required.

The conviction is AFFIRMED.

HUG, Circuit Judge, dissenting:

I respectfully dissent.

I agree that the prosecution's closing argument does not warrant a reversal and that there was no error in the refusal to authorize funds for an expert statistician. I also agree that it was appropriate under the facts of this case to give a *Jewell* instruction. I dissent because I believe the content of the *Jewell* instruction given by the district court was deficient.

The jury instructions given by the district court evidence an effort to simplify the language of instructions so as to be more understandable to the jury. This is commendable and should be strongly encouraged. In simplifying jury instructions, however, no element of an instruction may be omitted. The instruction given by the district court on deliberate ignorance, the so-called "*Jewell* instruction," left out a crucial element and is therefore deficient.

The problem with the district court's instruction is the same problem this court found in *United States v. Valle-Valdez*, 554 F.2d 911 (1977). In *Valle-Valdez*, we held that knowledge cannot be imputed merely because the defendant "acted with a conscious purpose to avoid learning the truth;" the jury must also find beyond a reasonable doubt that the defendant was "aware of the

high probability" of the existence of the fact. *Id.* at 914.

The degree of that probability is important. It would not be enough if Suttiswad had a hunch that there might be contraband hidden in his suitcase or was worried that it might be there or was suspicious—there must be an awareness of a high probability that the contraband was in the suitcase. *See United States v. Jewell*, 532 F.2d 697, 704 (9th Cir. 1976). The instruction given here, as was the case in *Valle-Valdez*, failed to convey this important element.

The district court instructed the jury that "negligence or mistake alone is not sufficient to support a finding of ... knowledge" and that a finding that the defendant "deliberately closed his eyes to what otherwise would have been obvious to him" was sufficient. The majority believes that this satisfies the "high probability" requirement. I disagree.

The instruction that "negligence or mistake alone is not sufficient," although accurate, did not convey, as *Valle-Valdez* requires, that Suttiswad must have been aware of the high probability that contraband was hidden in his suitcase. The gap between "negligence or mistake" and awareness of a high probability is considerable.

Suttiswad would have been "negligent" if a reasonable person would have suspected that the suitcase contained contraband and checked further. This is an objective determination and is completely unlike the subjective awareness the defendant must have under *Valle-Valdez*.

A "mistake" would have been a belief that he was not carrying contraband. Suttiswad would have been mistaken if, for example, he believed that the heroin was talcum powder. This part of the instruction fails to cover the broad range of beliefs between believing he was not carrying contraband and being aware of the high probability that he was carrying contraband.

The "negligence or mistake" portion of the instruction provided no guidance in the situation where the defendant was suspi-

cious but his suspicions did not rise to the level of a high probability. It also provided no guidance in the situation where the defendant had no idea and no reason to believe that the item was in his possession at all. In short, this portion of the instruction fails to convey that the defendant must have been subjectively aware of the high probability that he was carrying contraband.

The part of the instruction stating that "the element of knowledge may be satisfied by [finding] that a defendant deliberately closed his eyes to what otherwise would have been obvious to him" also fails to convey the requirement that the defendant must actually be aware of a high probability of the existence of the fact. He could have "deliberately closed his eyes" because he had a faint suspicion.

Another part of the instruction states: "A finding beyond a reasonable doubt of a conscious purpose to avoid enlightenment would permit an inference of knowledge." This portion of the instruction is subject to exactly the same defect as the instruction in *Valle-Valdez.* We stated in *Valle-Valdez:*

> Applying *Jewell,* we conclude that the instruction given in the present case was deficient. That instruction permitted conviction on proof "beyond a reasonable doubt that the Defendant acted with a conscious purpose to avoid learning the truth of the contents of the vehicle." As far as it goes, this instruction is correct. The error or deficiency lies in the instruction's failure to add that the defendant's "conscious purpose to avoid learning the truth" is culpable only if the jury also finds beyond a reasonable doubt that he was aware of the high probability that the vehicle carried contraband. A deliberate avoidance of knowledge is culpable only when coupled with a subjective awareness of high probability.

554 F.2d at 914. The instruction given in this case would permit conviction on deliberate avoidance of knowledge without a subjective awareness of high probability.

Because instructions approved on appeal tend to be instructions given in future cases, we have a particular responsibility to point out deficiencies. I am hopeful that the district courts will in the future make clear the "high probability" requirement of *Valle-Valdez* while continuing their endeavor to simplify jury instructions.