46 F.3d 1148
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Miguel Angel QUINONES, Defendant-Appellant.
 No. 93-10751.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted: Dec. 12, 1994.
Decided: Jan. 25, 1995.
 
 Before: WALLACE, Chief Circuit Judge, PREGERSON and BEEZER, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Miguel Angel Quinones appeals his jury conviction for conspiring to distribute and possess cocaine with intent to distribute (21 U.S.C. Sec. 846), possession of cocaine with intent to distribute (18 U.S.C. Sec. 924(c)(1)), and use of a firearm during a drug trafficking crime (18 U.S.C. Sec. 924(c)(1)). We affirm.
 
 
 3
 This case involves three distinct challenges to Quinones' conviction. Because the facts necessary to assess each claim are distinct, we recite them separately below.
 
 I. SUFFICIENCY OF THE EVIDENCE
 A. Background
 
 4
 This case arises from a cocaine buy that Detective Canuto Garza, an undercover officer in the Tulare County Sheriff's Office, arranged with Quinones' co-defendant, Eduardo Corrales. Detective Garza set up a five-kilogram cocaine buy that was to take place at Corrales' house. Corrales told Garza that he had contacted a friend who lived in Tracy, California who was going to supply him with some cocaine.
 
 
 5
 On the morning of October 22, 1992, Corrales spoke to Garza and said "his people" were on their way. Early that afternoon, Corrales again called Garza and said that "his people" had arrived with the cocaine. At that same time, police watching Corrales' house noted that Gustavo Nunez's white Buick and Salvador Sanchez's brown Mazda were parked out front.
 
 
 6
 Nunez had called Corrales earlier that day and told him that everything was ready and that he would bring the cocaine to the house. Nunez arrived at Corrales' house early in the afternoon. Sanchez and Quinones arrived separately in Sanchez's car, and introduced themselves to Corrales. Corrales invited all three men into his home and offered them a beer while they waited for Garza to arrive in Merced.
 
 
 7
 While waiting in Corrales' house, Nunez explained that Sanchez was in charge of the merchandise. Quinones and Nunez were both present when Nunez made this statement. Also, again in the presence of Nunez and Quinones, Corrales discussed the possibility of acquiring more cocaine from Sanchez for future deals.
 
 
 8
 The deal was originally supposed to take place at Corrales' house. But late in the afternoon, Detective Garza called Corrales and asked him to meet him at the K-Mart parking lot in Merced. Corrales drove to the parking lot with his wife Georgette in their red Geo. Once they arrived, Detective Garza asked Corrales to bring one kilogram of cocaine to the parking lot. Corrales sent Georgette back to the house to retrieve it.
 
 
 9
 Georgette returned to the house where she told Nunez, Sanchez and Quinones that Corrales had asked her to bring a sample of the drug to the parking lot. One of the men then went into the house and retrieved the toolbox that Georgette had earlier seen Nunez unload from his car.
 
 
 10
 Nunez got into the red Geo with Georgette and the toolbox. Georgette then saw Quinones and Sanchez get into Sanchez's brown Mazda. The brown car, in which Quinones was a passenger, closely followed the red car from Corrales' house to the area near the K-Mart parking lot. When they arrived at the area near the K-Mart, the red car went into the parking lot. The brown car drove past the parking lot, turned around, and drove past the parking lot again.
 
 
 11
 After Georgette and Nunez arrived, Garza asked Nunez if he had the kilogram of cocaine. Nunez said that it was in a toolbox behind the seat. Garza opened the toolbox, saw the cocaine, and gave the arrest signal.
 
 
 12
 After the arrest signal came over the radio, a surveillance unit pursued the brown Mazda, which drove backwards down 14th Street through an intersection at approximately 25-30 miles per hour. The car then made a U-turn and drove down onto Highway 99, failing to stop at stop signs along the way. The brown Mazda drove down Highway 99, first in the fast lane going 50-55 miles an hour, then in the slow lane at 45-50 miles an hour. The passenger threw a paper bag out of the window when the car was in the fast lane, and then threw a handgun and another object out of the window when the car moved into the slow lane.
 
 
 13
 Traffic slowed at a controlled intersection in Livingston, California. Traffic had been stopped at this intersection to clear the way for the pursuit by the surveillance unit. The Mazda left the highway at Turlock, slowed rapidly and drove into a restaurant parking lot where the occupants were arrested.
 
 
 14
 Other officers searched the side of Highway 99 where the firearms were thrown from the Mazda. They found a Beretta, 9mm semi-automatic which was fully loaded with the hammer down. The officers also found a .22 semi-automatic handgun, also loaded.
 
 B. Analysis
 
 15
 Quinones claims that his convictions rest on insufficient evidence. We will uphold a conviction "if, viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of each essential element of the crime charged." United States v. Penagos, 823 F.2d 346 (9th Cir. 1986).
 
 
 16
 Quinones asserts that the evidence was insufficient as to two different charges for which he was convicted, the conspiracy to distribute cocaine charge, as well as the charge of possession of cocaine with intent to distribute.
 
 1. Conspiracy to Distribute Cocaine
 
 17
 To prove a conspiracy, the government must show an agreement to accomplish an illegal objective and the requisite intent necessary to commit the underlying offense. United States v. Shabani, 115 S. Ct. 382 (1994). Quinones does not dispute that a conspiracy to distribute and possess cocaine existed. Rather, he contends that the government failed to prove that he was even slightly connected to it.
 
 
 18
 Once the existence of the conspiracy is shown, "evidence establishing a defendant's slight connection with the conspiracy beyond a reasonable doubt is sufficient to convict the defendant of knowing participation in the conspiracy." United States v. Garza, 980 F.2d 546, 552 (9th Cir. 1992).
 
 
 19
 The government contends that Quinones' connection to the conspiracy was as a protector for Nunez, the supplier of the cocaine. According to the government, the evidence established that Quinones and Sanchez were involved in counter-surveillance activities. The government notes further that counter-surveillance activities qualify as acts in furtherance of a conspiracy. United States v. Mares, 940 F.2d 455, 458 (9th Cir. 1991).
 
 
 20
 In United States v. Mares, we explained that counter-surveillance is most useful "'at times or places where the risk of detection and capture is greatest, i.e., at meetings between buyers and sellers and during actual transfer of drugs to buyers."' Id. at 459, quoting United States v. Penagos, 823 F.2d 346, 349 (9th Cir. 1987). The court found the fact that the appellants in Mares were present and watching at the time when the drugs were to be exchanged, "precisely the time that counter-surveillance is most helpful and most common," to be probative of their role as look-outs. Id.
 
 
 21
 The appellants' mere presence in Mares was not enough, in itself, to establish that they knew of the conspiracy and were acting in furtherance of it. The court found sufficient evidence, however, by considering the additional evidence that the appellants "spoke at some length with the drug courier minutes before the transaction was to occur, circled the site numerous times, ... and appeared to be watching the deal." Id.
 
 
 22
 In the present case, the jury heard similar testimony. Quinones was a passenger in a car that followed closely behind the car containing the drugs. Nunez, the supplier of the drugs, told Georgette, his fellow passenger in the front car, that Quinones and Sanchez would be following them. In addition, Sanchez drove past the K-Mart parking lot, turned around and was heading back towards the parking lot again at the time when police began pursuing Sanchez and Quinones. Moreover, Sanchez led the police on a lengthy chase, and a police witness testified that he saw Quinones himself throw two guns out the car window.
 
 
 23
 In Mares we found that "while no individual fact or inference is sufficient to establish the appellants' connection to the conspiracy, the facts within the record, when considered in their totality, create a rather persuasive case for guilt." Id. at 458. We believe that the evidence recited above supports the same conclusion.
 
 
 24
 Quinones argues that his case is controlled by United States v. Ramos-Rascon, 8 F.3d 704 (9th Cir. 1993), a recent case where we reversed after finding insufficient evidence to support a finding that appellants participated in a conspiracy. Quinones is correct that the facts in Ramos-Rascon are in many ways similar to the case at hand.
 
 
 25
 The appellants in Ramos-Rascon rode in a truck that followed closely behind the truck transporting the drugs. The appellants looked alertly around as they drove. Their truck overshot the entrance of the parking lot of the hotel where the deal was to take place, re-entered the lot at another entrance, and drove back through the lot, parking near the undercover agents' room. The appellants sat on a wall outside the hotel, "chatting desultorily," and watching passing cars intently, as the deal was consummated inside. One of the appellants tried to run away when pursued. Ramos-Rascon, 8 F.3d at 704.
 
 
 26
 The government's theory in Ramos-Rascon was that the appellants were engaged in counter-surveillance. But the Ramos-Rascon opinion notes that although the government's own witnesses stated that "those engaged in countersurveillance for drug dealers commonly possess weapons and communicative devices," the appellants in that case had neither weapons nor walkie-talkies or a mobile phone. Id. In contrast, the evidence in the present case strongly suggests that Quinones and Sanchez possessed two fully-loaded semi-automatic weapons. The evidence of the guns dramatically distinguishes this case from Ramos-Rascon. United States v. Segura-Gallegos, No. 92-50253, slip. op. 13849 (9th Cir. Nov. 14, 1994) (distinguishing Ramos-Rascon on ground that defendant was in possession of a firearm).
 
 
 27
 We believe the evidence in this case points to more than Quinones' "mere causal association with conspiring peopled." United States v. Bautista-Avila, 6 F.3d 1360, 1363 (9th Cir. 1993). Instead, we find sufficient evidence to support Quinones' conspiracy conviction because, viewed in the light most favorable to the government, a reasonable jury could have found evidence beyond a reasonable doubt of Quinones' participation in the conspiracy.
 
 
 28
 2. Possession of Cocaine with Intent to Distribute
 
 
 29
 A conviction for possession with intent to distribute narcotics may be based on one of three legal theories: (1) co-conspirator liability; (2) aiding and abetting; and (3) exercising dominion and control over the contraband. United States v. Sanchez-Mata, 925 F.2d 1166, 1168-1169 (9th Cir. 1991).
 
 
 30
 We concluded above that the government presented sufficient evidence to convict Quinones of conspiracy to distribute cocaine. Thus, he is liable for the acts committed by his co-conspirators under a Pinkerton theory. Pinkerton v. United States, 328 U.S. 640, 645-47 (1946); Mares, 940 F.2d at 460. It is undisputed that Quinones' co-defendants possessed cocaine with intent to distribute. Thus, having affirmed Quinones' conspiracy conviction, we also affirm his conviction for possession of cocaine with intent to distribute.
 
 II. IMPAIRMENT OF PEREMPTORY CHALLENGES
 A. Background
 
 31
 Quinones argues that the jury selection process employed by the district court restricted his right to exercise his peremptory challenges intelligently.
 
 
 32
 In this case, the district court followed the "Arizona" method of jury selection.[1] The clerk filled twenty-eight seats with prospective jurors. The court voir dired the twenty-eight jurors, and excused some jurors for cause. After a juror was excused for cause, that juror's seat was taken by a prospective juror who was not among the initial twenty-eight called, so that all twenty-eight seats remained filled.
 
 
 33
 The initial twenty-eight prospective jurors were seated as follows: fourteen were seated in the jury box, which included seats for two alternates. Those jury box seats were numbered 1 through 14. The next seven jurors, numbered 15 through 21, were seated in seven chairs in front of the jury box. The remaining seven jurors, numbered 22 through 28, were seated within the well of the courtroom on a bench.
 
 
 34
 The court allocated four peremptory challenges to each defendant, for a total of twelve defense peremptories.[2] The court allocated seven peremptory challenges to the government. Thus the total number of peremptory challenges allotted was nineteen.
 
 
 35
 After the government and the three defendants passed for cause, the government and defense counsel together exercised seventeen peremptory challenges against the twenty-eight jurors who had been passed for cause. Thus out of the initial twenty-eight, only eleven remained. Of the two unexercised peremptories, one belonged to Quinones, and the other to the government. All three defense counsel as well as the prosecutor used some of their peremptory challenges on jurors seated in seats 13 through 28.
 
 
 36
 At this point, for reasons that are unclear, the district court directed the clerk to fill the empty seats in the jury box with prospective jurors from the pool of jurors that had not been subjected to voir dire. Nine new jurors were seated in the jury box, occupying the seats of the excused jurors. Quinones' counsel objected to this procedure, and suggested that the court should first move into the jury box the six prospective jurors remaining from the original twenty-eight seated in seats 14 through 28. Had this suggestion been followed, the jury box would have contained all eleven prospective jurors who had survived both challenges for cause and peremptory challenges. The court overruled the objection.
 
 
 37
 The court then conducted voir dire on the nine newly-seated jurors. Three were excused for cause. So there now remained six jurors seated in the box who had never been subjected to a peremptory challenge. The district court then directed that the strike sheet be passed. The government and Quinones each exercised their one remaining strike on the six new jurors remaining in the jury box. The court then filled the three empty spots in the jury box with three jurors taken from those who remained from the original fourteen seated outside the jury box. So the jury now contained four members who were not considered when both sides originally exercised a total of seventeen strikes.
 
 B. Analysis
 
 38
 This Court reviews for abuse of discretion the procedure selected by the district court for the exercise of peremptory challenges. United States v. Warren, 25 F.3d 890, 894 (9th Cir. 1994).
 
 
 39
 Though the peremptory challenge is one of the accused's "most important rights," neither the number of peremptories nor the manner of their exercise is constitutionally secured. United States v. Turner, 558 F.2d 535, 538 (9th Cir. 1977) (citations omitted). The district court has wide discretion in setting the procedures for the exercise of peremptory challenges, but "the method chosen by the district court must not unduly restrict the defendant's use of his challenge." Id. In addition, the defendant must be given adequate notice of the system that the court uses for exercising peremptories. Id.
 
 
 40
 Quinones makes two related claims of error regarding the peremptory challenge procedure exercised by the district court. First, Quinones argues that the court did not give him the required notice as to what procedure it would use. Second, Quinones argues that the court restricted his right to exercise his peremptory challenges intelligently.
 
 1. Adequate Notice
 
 41
 Local Rule 162 of the Eastern District of California states that "[c]ounsel shall consult with the courtroom deputy clerk of the assigned trial Judge for procedures utilized by that Judge in the selection of a jury." In addition to that notice, the district judge called counsel into chambers immediately before the start of jury selection and explained to counsel the procedure the court planned to follow. The court did not notify counsel during this in-chambers session that it would replace stricken jurors with prospective jurors taken from the pool. But although the court did not inform counsel of all these specifics, we find that Quinones has failed to show how this unexplained procedure in fact impaired his right to exercise his peremptory challenges.
 
 2. Impairment of the Use of Peremptories
 
 42
 Quinones argues that his right to exercise his peremptories was impaired because he only had one strike left to challenge the six new jurors remaining in the jury box after three were excused for cause. Quinones contends that he wasted "two or possibly three" peremptory challenges on jurors who were seated outside the jury box in seats 15 through 28 because he expected the court to move those jurors into the jury box as vacancies occurred. Instead, over Quinones' objection, the court filled the empty spots in the box with new jurors who were not part of the original twenty-eight. In other words, Quinones was led to believe that jurors who survived challenges for cause and peremptory challenges would be seated in the order that they were initially called. It was with that procedure in mind that Quinones exercised two or possibly three of his strikes. Had Quinones known that the court intended to by-pass jurors 15 through 28 and place ahead of them nine new jurors, he would have exercised his strikes only on jurors 1 through 14 and not on jurors 15 through 28 because to do otherwise would have been a waste of a peremptory challenge.
 
 
 43
 In United States v. Christoffel, 952 F.2d 1086 (9th Cir. 1991), cert. denied, 112 S. Ct. 1700 (1992), we explicitly approved the Arizona method of exercising peremptories. Quinones does not challenge the Arizona method, but cites United States v. Turner, 558 F.2d 535, to support his argument that in his particular case the court placed an undue restriction on the exercise of his peremptories.
 
 
 44
 In Turner, we found an impermissible impairment of the appellant's peremptories under a very different set of facts. In that case, Turner was on trial with two other co-defendants. The three defendants decided that each defendant was to have three challenges, with the tenth peremptory to be exercised jointly. Turner, 558 F.2d at 536-37. The government and each of Turner's two co-defendants exercised one peremptory each. Turner three times accepted the panel as constituted. After a co-defendant exercised a second peremptory and a new juror was called, Turner tried for the first time to exercise a peremptory. The district court refused, stating that Turner had already used all three of his peremptories by three times accepting the panel as constituted. On appeal, we found that the district court's denial of Turner's peremptories to be reversible error.
 
 
 45
 The court in Turner noted the specificity of its ruling, when it stated the issue as "[whether] the defendant [can] be forced to forego a peremptory challenge each time he accepts a panel as then constituted." Id. at 538. We do not find the ruling in Turner to be relevant to the issue in the present case, which is whether the defendant's exercise of his peremptory challenges was impaired when the court failed to tell counsel that it would replace jurors struck from the jury box with jurors from the pool who had not yet been voir dired. Further, unlike the situation in Turner, Quinones was allowed to use all four of his assigned peremptories.
 
 
 46
 Instead, the present case is similar to United States v. Christoffel, supra, a case where we found the district court's practices did not amount to reversible error. In Christoffel, a district court, using the Arizona method, neglected to replace a juror who had been excused for cause. After the government and defense counsel exercised all their peremptories, only eleven jurors remained. At that point, the district court ordered another name drawn and a member of the pool was seated on the jury. The defendant did not attempt to strike the twelfth juror.
 
 
 47
 On appeal, the defendant in Christoffel argued that the district court should have sua sponte granted him another peremptory when it seated the twelfth juror. We disagreed, and found that because Christoffel exercised all ten of his peremptories and "exhibited no desire to strike the extra juror," his right to exercise his peremptory challenges had not been unduly restricted. Christoffel, 952 F.2d at 1088.
 
 
 48
 In the present case, Quinones objected only generally to the procedure used by the district court; he did not request additional peremptory challenges. After the court put the additional nine jurors into the jury box, and excused three for cause, Quinones and the government each used their remaining strike to remove two jurors. This left four of the newly called jurors on the jury, none of whom Quinones attempted to challenge by asking for additional peremptories or by even expressing on the record which of the four he wished to strike. In short, Quinones made no record to support a finding that his exercise of peremptory challenges was impaired.
 
 
 49
 We find that Quinones has not shown that the procedure employed by the district court in the present case unduly impaired his right to exercise his peremptory challenges in the circumstances of this case. While the court's actions may have surprised Quinones, we do not believe that the confusion caused by the district court's procedure amounted to an abuse of discretion.
 
 III. CONSTITUTIONALITY OF THE VENIRE
 A. Background
 
 50
 Quinones challenges his conviction based on the composition of his grand and petit juries. Quinones argues that because the district court used voter registration lists as the only source of grand and petit jurors, this resulted in the underrepresentation of Hispanics. Quinones alleges that the jury selection practices used in the Fresno division of the Eastern District of California violated the Equal Protection Clause, the Sixth Amendment's fair cross-section requirement, and the statutory requirements for grand and petit juries established by the Jury Selection and Service Act of 1968, 28 U.S.C. Secs. 1861-63.
 
 
 51
 Quinones filed three separate motions on the jury selection issue, each of which the district court denied. Quinones first filed a motion to dismiss the indictment based on the ethnic makeup of the jury wheel from which the grand jury was drawn. The district court denied the motion, because it found that five of the twenty-one members of the grand jury who returned an indictment against Quinones in 1992 were Hispanic, or about 24%. Quinones' expert witness in this case placed the 1992 population of voting-age Hispanics in the Fresno division at 21.3%, while the government expert placed the amount at 19.6-19.9%.
 
 
 52
 Quinones then filed another motion to dismiss the indictment, this time alleging the same problems with petit jury selection. The district court again denied the motion, erroneously stating that Quinones had failed to present evidence as to the jury wheel from which the petit jury was drawn. Instead, Quinones had actually failed to present evidence about the wheel from which the grand jury was drawn.[3]
 
 
 53
 Finally, Quinones filed a motion to reconsider his motion regarding the petit jury. The district court denied this motion. In reaching its ruling, the court applied the three-pronged test of Duren v. Missouri, 439 U.S. 357 (1979) and found no Sixth Amendment or statutory violation. It does not appear from the record that the district reached Quinones' equal protection allegation.
 
 B. Analysis
 
 54
 The district court's denial of the motion to dismiss the indictment on the grounds that the grand and petit juries were not properly constituted presents a mixed question of law and fact which we review de novo. United States v. Miller, 771 F.2d 1219, 1227 (9th Cir. 1985).
 
 
 55
 In Duren v. Missouri, 439 U.S. 357 (1979), the Supreme Court held that to establish a prima facie violation of the fair cross-section requirement, a defendant must show: (1) the group alleged to be excluded is a distinctive group in the community; (2) the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; (3) this underrepresentation is due to systematic exclusion of the group in the jury selection process. Duren, 439 U.S. at 364.
 
 1. Challenge to the Grand Jury
 
 56
 Quinones argues that the court erred when, in reviewing Quinones' claim as to the grand jury, it confined its inquiry to the racial composition of the twenty-one member grand jury that indicted him. We need not reach this issue, however, because Quinones failed to present any evidence to the district court as to the racial composition of the four-year wheel from which his grand jury was drawn. Quinones' expert only analyzed the 1992 jury wheel. This means that Quinones did not meet the second prong of the Duren test as to his grand jury claim. That is, because Quinones did not present any analysis of the jury wheel from which the grand jury was drawn, he did not make a showing that the representation of Hispanics in the wheels from which the grand jury was drawn "[was] not fair and reasonable in relation to the number of such persons in the community." Duren, 439 U.S. at 364.
 
 2. Challenge to the Petit Jury
 
 57
 a. Sixth Amendment and Statutory Challenges
 
 
 58
 Quinones charges that the 1992 jury wheel from which his petit jury was drawn violated his Sixth Amendment right to a jury made up of a fair cross-section of the community, as well as his statutory claim to the same, under the Jury Selection and Service Act. "The test for a constitutionally selected jury is the same, whether challenged under the Sixth Amendment of the Constitution or under the Jury Selection and Service Act." United States v. Miller, 771 F.2d 1219, 1227 (9th Cir. 1985). Thus we can evaluate both claims simultaneously under the three-part Duren test recited above.
 
 
 59
 The government does not contest that Quinones has met the first prong of the Duren test. "Hispanics are members of a distinctive and identifiable group in the community." United States v. Sanchez-Lopez, 879 F.2d 541, 547 (9th Cir. 1989), citing Castaneda v. Partida, 430 U.S. 482, 495 (1977).
 
 
 60
 Under the second prong of the Duren test, Quinones was required to show that the representation of Hispanics on the jury source list from which juries are selected is not fair and reasonable in relation to the number of Hispanics in the community. Quinones presented the analysis of an expert demographer who found that Hispanics are underrepresented by an absolute disparity of 10.05% in the 1992 jury wheel.[4]
 
 
 61
 A 10.05% absolute disparity is not high enough to meet the second prong of the Duren test. This circuit has consistently held that absolute disparities below 7.7% are insubstantial and constitutionally permissible. United States v. Suttiswad, 696 F.2d 645, 648 (9th Cir. 1982) (7.7% absolute disparity for Hispanics, 4.7% for Asians, 2.8% for Blacks); United States v. Kleifgen, 557 F.2d 1293, 1297 (9th Cir. 1977) (2.9% for Blacks, 4.4 % for males); United States v. Armstrong, 621 F.2d 951, 956 (9th Cir. 1980) (2.8% for Blacks). See also United States v. Rodriguez, 776 F.2d 1509, 1511 (11th Cir. 1985) ("Although precise mathematical standards are not possible, this circuit has consistently found that a prima facie case of underrepresentation has not been made where the absolute disparity ... does not exceed 10%."). Quinones cites no cases, from this circuit or otherwise, which have found a Duren violation where there is a 10.05% disparity (in fact, Quinones did not provide the court with any cases where courts found Sixth Amendment violations).
 
 
 62
 Some courts have held that an absolute disparity on the order of twenty percentage points violates the second part of the Duren test. United States v. Irurita-Ramirez, 838 F. Supp. 1385, 1389 (C.D. Cal. 1993) (listing cases). Moreover, courts examining evidence presented in Duren claims have stated a strong preference for examining data on jury source lists and area populations collected over a period of several years. Ramseur v. Beyer, 983 F.2d 1215, 1235 (3rd Cir. 1992), cert. denied, 113 S. Ct. 2435 (1993) (listing cases). Quinones has only presented evidence as to one year.[5]
 
 
 63
 Since the absolute disparity under the 1988 jury wheel is within constitutional limits, we do not need to reach the third prong of the Duren, which requires the court to evaluate whether the underrepresentation is caused by systematic exclusion.[6] We thus affirm the ruling of the district court that Quinones has failed to make out a prima facie claim that the Fresno division's jury selection procedures violate the Sixth Amendment or the Jury Service and Selection Act.
 
 
 64
 b. Equal Protection Challenge
 
 
 65
 To demonstrate an equal protection violation when challenging the jury selection process, a defendant must demonstrate that: (1) a cognizable group, of which he is a member; (2) has been underrepresented over a significant period of time; and (3) that the selection procedure is susceptible to abuse or is not racially neutral. Castaneda v. Partida, 430 U.S. 482, 494 (1977).
 
 
 66
 Quinones has met the first part of the Castaneda test, as Hispanics are a cognizable group. Id. at 495. Quinones cannot meet the second prong of the Castaneda test, however, because he has presented no evidence covering a "significant period of time." As we stated above, Quinones has only presented evidence as to one year (July 1, 1988 to July 1, 1989). As for the third part of the equal protection inquiry, Quinones has not made any argument as to how the selection procedure in the Fresno division is susceptible to abuse or not racially neutral.
 
 
 67
 Quinones has failed to make out a prima facie equal protection claim as to the jury selection process in the Fresno division of the Eastern District of California.
 
 IV. CONCLUSION
 
 68
 We find that there was sufficient evidence to support Quinones' conviction for conspiracy to distribute and possess cocaine with intent to distribute, as well as his conviction for possession of cocaine with intent to distribute. We also find that the district court did not unduly impair Quinones' right to exercise his peremptory challenges intelligently. Finally, Quinones has failed to present adequate evidence to support a finding that jury selection procedures in the Fresno division of the Eastern District of California violated his Sixth Amendment, statutory, or equal protection rights.
 
 
 69
 We AFFIRM.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir. R. 36-3
 
 
 [1]
 Under the Arizona method, the clerk draws a number of names from the pool of potential jurors. The jurors whose names are drawn then undergo voir dire. When a member is excused for cause, a replacement is selected from the courtroom pool. After the challenges for cause are completed, the government and defense counsel exercise their peremptory challenges. If the original venire is of the correct size, the system assures that a sufficient number of members will survive the peremptory challenge process to form the jury. United States v. Christoffel, 952 F.2d 1086, 1088 (9th Cir. 1991), cert. denied, 112 S. Ct. 1700 (1992)
 Under Fed. R. Crim. P. 24(b), where the offense charged is punishable by more than one year in prison, the minimum number of peremptories required are six to the government, and ten to the defendant or defendants, for a total of sixteen peremptories. Thus if the court in this case had assigned the minimum required number of peremptories and counsel had used all of them, then there would have been a sufficient number of jurors remaining to make up a jury. In this case, however, the court began with twenty-eight, but assigned nineteen peremptories.
 
 
 [2]
 Quinones was tried with his co-defendants Nunez and Sanchez. Eduardo Corrales and his wife Georgette pled guilty prior to the trial
 
 
 [3]
 The grand jury in this case was drawn from the four-year 1988-1991 wheel. Shortly thereafter, the Fresno division abandoned the use of a four-year wheel. The petit jury in this case was drawn from the one-year July 1, 1991-July 1, 1992 wheel ("the 1992 wheel")
 
 
 [4]
 Absolute disparity is determined by taking the percentage of the group at issue in the total population and subtracting from it the percentage of that group as represented on the jury wheel. Sanchez-Lopez, 879 F.2d at 547. In this case, the defense expert subtracted 11.25%, which was his conclusion as to the representation of Hispanics on the 1992 wheel, from 21.30%, which was the defense expert's figure as to the Hispanic voting-age population for the Fresno division
 In denying this motion, the district court did not rely on figures submitted by the government, which put the absolute disparity at between 8.35% and 8.65%, but instead on yet another calculation (based on figures produced by the jury commissioner) which put the absolute disparity at 7.66%. We base our analysis on the higher number submitted by the defense to demonstrate that even under the higher figure, Quinones' claim must fail.
 Quinones also asserts that we should decide this claim by applying a comparative disparity test. Comparative disparity is determined by taking the absolute disparity percentage and dividing that number by the percentage of the group in the total population. Thus under the defense expert's figures, Hispanics are underrepresented by 47% (10.05% divided by 21.30%). But we have repeatedly rejected this measure, because it exaggerates the effect of the deviation. See United States v. Kleifgen, 557 F.2d 1293, 1297 (9th Cir. 1977); United States v. Suttiswad, 696 F.2d 645, 648-49.
 
 
 [5]
 Quinones asserts in his opening brief that he "provided to the district court data that shows an absolute disparity of over 10% for the preceding 4 years ...." Red brief at 32. Quionones makes no citation (either to the excerpt of record or to the case record as a whole) to support this assertion, and there is no mention of any such data in the orders filed by the district court
 
 
 [6]
 Quinones appears to allege that the Fresno division's use of voter registration lists as the exclusive source of names for the jury wheel results in systematic exclusion. In United States v. Brady, 579 F.2d 1121, 1134 (9th Cir. 1978), we approved a jury selection system that relied exclusively on voter registration lists. Quoting the legislative history of the Jury Service and Selection Act, we found that Congress had already contemplated and rejected the argument that exclusive reliance on voter registration lists discriminates against groups whose members register to vote in lower proportion than the rest of the population. Id., citing 1968 U.S. Code Cong. & Admin. News, p. 1795