**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

<table>
<tr>
<td>

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

SALVADOR HERNANDEZ-ESTRADA,
*Defendant-Appellant*.

</td>
<td>

No. 11-50417

D.C. No.
3:10-cr-00558-
BTM-1

OPINION

</td>
</tr>
</table>

Appeal from the United States District Court
for the Southern District of California
Barry T. Moskowitz, District Judge, Presiding

Argued and Submitted
September 6, 2012—Pasadena, California

Filed December 5, 2012

Before: Alex Kozinski, Chief Judge, Paul J. Watford and
Andrew D. Hurwitz, Circuit Judges.

Opinion by Judge Hurwitz;
Concurrence by Chief Judge Kozinski

# SUMMARY[*]

### Criminal Law

The panel affirmed an illegal reentry conviction in a case in which the defendant argued that in compiling its 2009 master jury wheel, the Southern District of California violated the Jury Selection and Service Act of 1968 and the Constitution.

Applying the absolute disparity rule, the panel held that because a juror source list consisting only of registered voters did not substantially underrepresent African-Americans or Hispanics in the community, the Southern District's failure to supplement that list did not violate the Sixth Amendment. The panel also held that because the defendant neither alleged nor showed discriminatory intent, there was no Fifth Amendment equal-protection violation.

The panel wrote that the Southern District Clerk's Office should not automatically disqualify individuals who express doubt about their English skills, and should not put off preparing statistical jury-representativeness forms required by the Act, but that these technical violations did not frustrate the Act's goals and do not warrant merits relief in this case.

The panel held that the Southern District's dismissal of prospective jurors based solely on a "no" answer to a question whether jurors "read, write, speak and understand the English language" was not a substantial violation of the Act because

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

it did not interfere with the Act's key goals of randomness and objectivity. The panel also held that the defendant did not demonstrate that the Southern District substantially departed from the requirements of the Act by failing to return questionnaires to prospective jurors who failed to answer questions on race and/or ethnicity.

The panel cautioned the Southern District to take note of the statutory violations identified and amend its practices in the future.

Chief Judge Kozinski (joined by Judge Watford) concurred without enthusiasm because the rule the panel is bound to apply – *i.e.*, measuring disparity for fair cross section purposes by looking at absolute disparity, and accepting up to 7.7% of the total jury pool as a permissible deviation – is clearly wrong.

## COUNSEL

Michele A. McKenzie, Federal Defenders, San Diego, California, for Defendant-Appellant.

Laura E. Duffy, United States Attorney; Bruce R. Castetter, David Curnow, and Victor P. White (argued), Assistant United States Attorneys, San Diego, California, for Plaintiff-Appellee.

**OPINION**

HURWITZ, Circuit Judge:

The question in this appeal is whether the United States District Court for the Southern District of California violated the Jury Selection and Service Act of 1968 ("JSSA") or the Constitution in compiling its 2009 master jury wheel. Although the Southern District departed from the requirements of the JSSA in several respects, we find no reversible error in the underlying conviction.

**I.**

Salvador Hernandez-Estrada was indicted for being a deported alien found in the United States in violation of 8 U.S.C. § 1326. Hernandez filed a motion to dismiss the indictment, arguing that the Southern District violated the JSSA and the Fifth and Sixth Amendments by using a juror source list consisting only of registered voters. He argued that the list underrepresented African-Americans and Hispanics. Hernandez also alleged that the Southern District violated the JSSA by (1) improperly disqualifying jurors for having insufficient English-language abilities based on their answers on the juror questionnaire; (2) improperly disqualifying jurors whose levels of English-language abilities were unclear; (3) failing to return questionnaires that omitted information on race and/or ethnicity; and (4) failing to keep jury representativeness statistics.

In response, the Government conceded that the Southern District had violated the JSSA, but disputed that any of the violations were substantial enough to warrant relief. *See* 28 U.S.C. § 1867(a) (providing for relief only for a

"substantial failure to comply" with the JSSA). The Government also disputed that the Southern District had violated the Constitution.

The district court denied Hernandez's motion to dismiss, finding no constitutional violation and that any JSSA violations were technical, not substantial, and so did not warrant dismissal. The district court nevertheless recommended that the Southern District make significant changes to its jury selection practices. Hernandez was convicted as charged.

Hernandez's appeal challenges only the denial of the motion to dismiss. "We review independently and non-deferentially a challenge to the composition of grand and petit juries," including challenges under the JSSA. *United States v. Sanchez-Lopez*, 879 F.2d 541, 546 (9th Cir. 1989).

## II.

### A.

Ordinarily, we would consider statutory claims before reaching constitutional arguments. *See Califano v. Yamasaki*, 442 U.S. 682, 692 (1979). But here Hernandez's constitutional arguments are intertwined with his JSSA claims. The JSSA contains a fair cross section guarantee, 28 U.S.C. § 1861, which is coextensive with the fair cross section requirement of the Sixth Amendment. *United States v. Miller*, 771 F.2d 1219, 1227 (9th Cir. 1985). Accordingly, it makes more sense to address Hernandez's constitutional claims first.

**1.**

The JSSA provides that prospective jurors "shall be selected from the voter registration lists or the lists of actual voters of the political subdivisions within the district or division." 28 U.S.C. § 1863(b)(2). Consistent with this requirement, the Southern District selects prospective jurors at random from the list of registered voters in the district. The JSSA further provides, however, that districts "shall prescribe some other source or sources of names in addition to voter lists where necessary to" ensure a fair cross section, afford all citizens the opportunity to be considered for jury duty, and ensure that individuals are not excluded on the basis of "race, color, religion, sex, national origin, or economic status." 28 U.S.C. §§ 1861, 1862, 1863(b)(2). The Southern District does not supplement its source list. Hernandez argues that its failure to do so violates the Fifth and Sixth Amendments.

"The test for a constitutionally selected jury is the same, whether challenged under the Sixth Amendment of the Constitution or under the Jury Selection and Service Act." *Miller*, 771 F.2d at 1227.

> In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic

exclusion of the group in the jury-selection process.

*Duren v. Missouri*, 439 U.S. 357, 364 (1979). Hispanics and African-Americans are each distinctive groups under the first prong of this test. *United States v. Cannady*, 54 F.3d 544, 547 (9th Cir. 1995).

"The second prong of the *Duren* test requires proof, typically statistical data, that the jury pool does not adequately represent the distinctive group in relation to the number of such persons in the community." *United States v. Esquivel*, 88 F.3d 722, 726 (9th Cir. 1996). In analyzing the second prong, we use the absolute disparity test, which requires us to measure underrepresentation "by taking the percentage of the group at issue in the total population and subtracting from it the percentage of that group that is represented on the master jury wheel." *Sanchez-Lopez*, 879 F.2d at 547; *see also United States v. Rodriguez-Lara*, 421 F.3d 932, 942–943 (9th Cir. 2005) (re-affirming our commitment to the absolute disparity test); *Berghuis v. Smith*, 130 S. Ct. 1382, 1393–94 (2010) (neither requiring nor prohibiting the use of any particular test in addressing claims of underrepresentation).[1] Although we have never drawn an

---

[1] Because our precedents require use of the absolute disparity test, we have no occasion today to consider other methodologies to analyze the representativeness of the Southern District wheel. The difficulty with use of the absolute disparity test in dealing with small populations was recognized in *Berghuis*, 130 S. Ct. at 1393. But, as the Court noted in declining to dictate the use of any particular methodology, "[e]ach test is imperfect." *Id.* For example, other courts have questioned the utility of the standard deviation test. *See, e.g.*, *United States v. Rioux*, 97 F.3d 648, 655 (2d Cir. 1996) ("It is illogical to apply a theory based on random selection when assessing the constitutionality of a qualified wheel. By

exact line, we have held that a disparity of 7.7% is acceptable. *Rodriguez-Lara*, 421 F.3d at 943–44.

We "must rely on the statistical data that best approximates the percentage of jury-eligible [members of the group] in the district." *United States v. Torres-Hernandez*, 447 F.3d 699, 704 (9th Cir. 2006). In 2009, 22.5% of the Southern District's citizen population 18 and over was Hispanic and 5.2% was African-American.

We compare those percentages to the percentages of Hispanics and African-Americans in the wheel. *Sanchez-Lopez*, 879 F.2d at 547. In determining the percentage of Hispanics in the jury wheel we exclude those who did not identify their ethnicity on the questionnaire; and in determining the percentage of African-Americans we exclude those who did not identify their race. *Rodriguez-Lara*, 421 F.3d at 944 n.11. Excluding these individuals, Hispanics made up 24.6% of the wheel and African-Americans made up 3.5%. Thus, Hispanics were overrepresented by 2.1% and African-Americans were underrepresented by 1.7%. Since these percentages do not begin to approach 7.7% underrepresentation, Hernandez's Sixth Amendment claim fails.

Hernandez urges that we instead include in our calculations individuals who failed to identify their race

definition, the qualified wheel is not the product of random selection; it entails reasoned disqualifications based on numerous factors. It is irrational to gauge the qualified wheel—an inherently non-random sample—by its potential for randomness."); *see also Berghuis*, 130 S. Ct. at 1393 (noting that "no court . . . has accepted [a standard deviation analysis] alone as determinative in Sixth Amendment challenges to jury selection systems." (quoting *Rioux*, 97 F.3d at 655) (brackets in original)).

and/or ethnicity.  As an initial matter, there is no way to know that those who failed to identify their race or ethnicity were not members of a minority group—after all, they did not reveal their race or ethnicity.  But even if we included them, Hernandez's claim still fails.  There were 40,743 persons in the qualified jury wheel, including non-responders to the race and/or ethnicity questions.   Of these, 1,257 identified themselves as African-American and 6,625 as Hispanic.  Thus, even if we assume that there was not a single African-American or Hispanic among the non-responders, African-Americans constituted 3.1% and Hispanics 16.3% of the qualified jury wheel.   Using these numbers, African-Americans were underrepresented by 2.1% and Hispanics by 6.2%.  Neither clears the 7.7% threshold.

## 2.

To establish a violation of the equal protection guarantee of the Fifth Amendment, a defendant must show not only substantial underrepresentation of a protected group but also "discriminatory intent." *Esquivel*, 88 F.3d at 725 (citing *Castaneda v. Partida*, 430 U.S. 482, 494 (1977)).  Even assuming that Hernandez could prove substantial underrepresentation, he has neither alleged nor shown discriminatory intent, so his Fifth Amendment claim also fails.

## III.

Because our rejection of Hernandez's constitutional claims dooms his fair cross section claim under the JSSA, *Miller*, 771 F.2d at 1227, we now turn to his remaining statutory claims.

## A.

Congress enacted the JSSA as a response to concerns that racial discrimination frequently infected the jury selection process. *See Esquivel*, 88 F.3d at 725. In order to combat such discrimination, the JSSA prescribes a variety of procedures in compiling lists of prospective jurors. *See* 28 U.S.C. §§ 1861–69. "Congress, recognizing that there would undoubtedly be error in the jury selection process that should not result in the dismissal of an indictment, left room for harmless error by providing that dismissal should lie only when there was a substantial failure to comply with the Act." *United States v. Evans*, 526 F.2d 701, 705 (5th Cir. 1976). Thus, we will only dismiss Hernandez's indictment if he shows a "substantial" violation of the JSSA. 28 U.S.C. § 1867(a).

"Technical violations are insubstantial where they do not frustrate the Act's goals." *United States v. Nelson*, 718 F.2d 315, 318 (9th Cir. 1983). Those goals are "'random selection of juror names from voter lists'" and "'determination of juror disqualifications, excuses, exemptions, and exclusions on the basis of objective criteria only.'" *United States v. Goodlow*, 597 F.2d 159, 162 (9th Cir. 1979) (quoting H.R. Rep. No. 90-1076, at 2 (1968), *reprinted in* 1968 U.S.C.C.A.N. 1792, 1793).

## B.

Resolution of two of Hernandez's JSSA claims is straightforward. First, Hernandez argues that the Southern District failed to regularly complete form AO-12, which must be submitted to the Administrative Office of the United States

Courts every two years as the master jury wheel is refilled. *See* 28 U.S.C. § 1863(a).

The Southern District has been derelict in completing the AO-12s on time.  For example, the AO-12s for the 1999, 2001, and 2003 wheels were all completed in 2004 and the AO-12s for the 2005 and 2007 wheels were completed in November 2008.  This timing seems to be related to the filing of cases raising issues similar to those here. *See* Motion to Dismiss, *United States v. Martinez-Orosco*, No. 3:03-cr-02601-JAH (S.D. Cal. Oct. 8, 2004), ECF No. 47; Motion to Dismiss, *United States v. Garcia-Arellano*, No. 3:08-cr-02876-BTM (S.D. Cal. Nov. 7, 2008), ECF No. 21.

Nonetheless, by the time this litigation commenced Hernandez had access to all AO-12s dating back to 1999, including the AO-12 for the 2009 wheel, from which his grand and petit juries were selected.  Under these circumstances, the Southern District's past failures to complete these forms on time did not interfere with the goals of the JSSA.

Hernandez also claims that the Southern District clerk's office violated the JSSA by disqualifying approximately twelve Hispanics and six Asian-Americans because of doubts about their English language abilities.  When asked on the questionnaire whether they "read, write, speak and understand the English language," these individuals answered "Yes."  Perhaps inconsistently, however, they expressed doubts about their English language abilities elsewhere on the questionnaire.

The clerk's office appears to have disqualified any prospective juror who expressed doubt anywhere in the

questionnaire about English language abilities. This practice is troublesome. Although the clerk may disqualify jurors under the supervision of the court, 28 U.S.C. § 1865(a), these disqualifications appear to present precisely the kind of questionable determinations that should ultimately be made by a judicial officer. *See* S.D. Cal. Civ. R. 83.10(c)(5) ("Questionable requests for being excused or other status determinations must be directed to the court.").

Nevertheless, "[w]hile some technical errors were made, the fact that clerks, rather than a judge, made these determinations does not necessitate reversal." *Evans*, 526 F.2d at 706. We deal here only with about 18 jurors, a tiny fraction of the 40,743 in the qualified wheel. *See United States v. Bearden*, 659 F.2d 590, 606–07 (5th Cir. 1981) (finding erroneous dismissal of 495 prospective jurors insubstantial because they represented a small fraction of the total jury pool and the clerk's office did not use any subjective or discriminatory criteria). There is no indication that the clerk's office used any subjective criteria; it simply dismissed any juror who expressed doubts about English language ability. *See Goodlow*, 597 F.2d at 161–62 (finding no substantial violation where men with child custody were automatically excluded from jury service without a determination of hardship).

The Southern District Clerk's Office should not automatically disqualify individuals who express doubt about their English skills. Nor should it put off preparing AO-12s until litigation is filed. The district should take steps to remedy both of these issues, but neither merits relief in this case.

## C.

Hernandez's other claims are more substantive. Before 1968, prospective jurors were disqualified if "unable to read, write, speak, and understand the English language." 28 U.S.C. § 1861 (1957). The JSSA amended that standard, and now provides that a prospective juror should be disqualified only if he "is unable to read, write, and understand the English language with a degree of proficiency sufficient to fill out satisfactorily the juror qualification form" or if "unable to speak the English language." 28 U.S.C. § 1865(b)(2), (3).

Question 4 of the Southern District questionnaire asks, consistent with the old statutory standard, whether jurors "read, write, speak and understand the English language." In assembling the 2009 wheel, the clerk's office disqualified all prospective jurors who answered "no" to that question. The Government concedes that the dismissal of prospective jurors based solely on their answers to this question violated the JSSA but argues it is not a substantial violation.

Hernandez bears the burden "to present facts constituting a substantial violation." *Nelson*, 718 F.2d at 319. He argues that because "Congress deliberately excised a prejudice component" from the JSSA, *United States v. Okiyama*, 521 F.2d 601, 604 (9th Cir. 1975), he does not have to show that jurors were incorrectly disqualified. Hernandez is wrong. He still must prove that the violation was substantial; that is, it interfered with the key goals of the JSSA: randomness and objectivity. *Goodlow*, 597 F.2d at 162.

"For wrongful exclusions, determining whether there has been a substantial violation has both quantitative and

qualitative aspects." *Bearden*, 659 F.2d at 607.    The qualitative aspect focuses on "whether there has been a frustration of the Act's underlying principle of exclusions on the basis of objective criteria only." *Id.* Quantitatively, a violation that does not frustrate the Act's objectivity principle must result in a significant number of wrongful exclusions before it will be deemed substantial. *Id.*

There was no frustration of the JSSA's objectivity principle here. Indeed, it is hard to imagine any more objective criterion than the one used here. All prospective jurors who answered "no" to Question 4 were disqualified; the clerk's office exercised no discretion. *See United States v. Carmichael*, 560 F.3d 1270, 1278 (11th Cir. 2009).

Hernandez must therefore show that the improper wording of Question 4 resulted in a significant number of wrongful exclusions. Hernandez notes that of the 12,250 Hispanics who returned questionnaires, 1,420 were disqualified solely because they answered "no" to Question 4. But even if we assume that all 1,420 prospective jurors were wrongfully disqualified, that number does not establish a substantial violation when viewed, as it must be, in the context of the entire jury pool.

In *Bearden*, the Fifth Circuit found a violation insubstantial when it resulted in the wrongful exclusion of "only 1.2% of those screened" and "1.6% of those placed on the qualified wheels." 659 F.2d at 607. Here, the 1,420 jurors in question represent 2.0% of those who returned questionnaires and 3.5% of the qualified wheel. Although higher than the percentages held insubstantial in *Bearden*, these figures do not establish a substantial violation. *Cf. Okiyama*, 521 F.2d at 603–04 (finding violation substantial

when 14 of 23 grand jurors had submitted questionnaires containing "unanswered questions, ambiguous answers, and an indication of little knowledge of English"); *United States v. Hill*, 480 F. Supp. 1223 (S.D. Fla. 1979) (finding violation substantial when it impacted 40.3% of the jury pool).

Hernandez also notes that of those answering "no" to Question 4, 69.7% were Hispanic, and that the 1,420 Hispanic jurors excluded solely on the basis of their answers to Question 4 make up 25.2% of the 5,625 Hispanic jurors excluded for any reason. However, these statistics do not relate to the randomness and objectivity goals of the JSSA; they relate to the Act's fair-cross-section goal. As explained earlier, Hernandez has not established a substantial violation of the JSSA based on frustration of the Act's fair-cross-section goal. Notwithstanding any wrongful exclusions produced by the improper wording of Question 4, Hispanics are not substantially underrepresented in the qualified jury pool (and may even be slightly overrepresented). *See supra* at 8–9.

Simply because Hernandez has failed to make a showing that this violation is substantial does not mean a future defendant will also fail. The Southern District can and should remedy this problem. Asking Question 4 in its current form is not itself a violation of the JSSA, but dismissing prospective jurors solely because they answer "no" to that question is. Thus, although changing the language of the question is likely the easiest and most effective way to remedy this violation, it may not be the only way. We leave remediation to the district, but emphasize that change is necessary. And we caution other districts to evaluate their own questionnaires, as this problem appears not to be unique to the Southern District.

**D.**

Finally, Hernandez alleges that the Southern District's failure to return questionnaires to prospective jurors who failed to answer the questions on race and/or ethnicity violates 28 U.S.C. § 1864(a). That section states:

> In any case in which it appears that there is an omission, ambiguity, or error in a form, the clerk or jury commission shall return the form with instructions to the person to make such additions or corrections as may be necessary and to return the form to the clerk or jury commission within ten days.

*Id.*

Even assuming that § 1864(a) requires that *every* questionnaire with *any* omission be returned, Hernandez has not demonstrated that the Southern District substantially departed from the requirements of the JSSA. Section 1864(a) is plainly designed to serve the JSSA's goals of assuring that juries are "selected at random from a fair cross section of the community," 28 U.S.C. § 1861, and preventing discrimination in the selection process, 28 U.S.C. § 1862.

The representativeness of the 2009 wheel makes clear that neither goal was compromised here. Even if we assume that each non-responder was neither Hispanic nor African-American, the jury wheel nonetheless was fairly representative of the district. Moreover, no prospective juror was excluded for failure to respond to these questions, so there can be no contention that the district thereby used

subjective criteria in compiling the wheel.  *See United States v. Marcano*, 508 F. Supp. 462, 468 (D.P.R. 1980).

Nonetheless, the Southern District may not be so lucky in the future.  The percentages of those in the qualified wheel who did not answer the race and ethnicity questions—11.56% and 33.81% respectively—are significant.  If they remain so, it is not hard to imagine that in future years a court may be unable to conclude that the race or ethnicity of the non-responders could not have affected the legality of the resulting wheel.

The district must take appropriate steps to increase the response rate to these two questions.  While we leave to the district how exactly to accomplish that goal, we note that the district court suggested three potential remedies, all of which deserve careful consideration.

First, the district court noted that each questionnaire informed jurors that federal law required them to answer the questions on race and ethnicity to help prevent discrimination and that their answers would not affect their eligibility for jury service.  But that information was in small print on the back of the questionnaire.  The district court recommended moving that instruction to the front.  Second, the district court recommended reversing the order of the race and ethnicity questions so that the ethnicity question would come first.  Many jurors might not answer the ethnicity question when it follows the race question because they feel that doing so is unnecessary or redundant.  After all, the omission rate for the ethnicity question far exceeded that for the race question.

Finally, the district court noted that some districts permit online submission of questionnaires.  In such districts, the

questionnaire cannot be submitted online without completing the questions at issue here. The district should consider these options, as well as any others that might increase the response rate.

## IV.

Despite our conclusion that no reversible error exists here, we caution the Southern District (and others) to take note of the statutory violations we have identified and amend its practices in the future. For now, because no JSSA violation warrants relief and there was no constitutional violation, we affirm Hernandez's conviction and sentence.

**AFFIRMED.**

Chief Judge KOZINSKI, with whom Judge WATFORD joins, concurring:

I join Judge Hurwitz's opinion (except footnote one) because it faithfully applies the law of our circuit. *See United States* v. *Rodriguez-Lara*, 421 F.3d 932, 943 (9th Cir. 2005). But I do so without enthusiasm because the rule we are bound to apply is clearly wrong. It makes no sense to measure disparity for fair cross section purposes by looking at absolute disparity, and accept up to 7.7 percent of the total jury pool as a permissible deviation. *See United States* v. *Suttiswad*, 696 F.2d 645, 649 (9th Cir. 1982) (holding that 7.7 percent absolute disparity is acceptable). The absurdity of this number is brought home by observing that a group that is less than 7.7 percent of the total population can never be underrepresented, no matter how far the jury pool percentage

deviates from that in the total population.  *See Rodriguez-Lara*, 421 F.3d at 943 n.10.

This anomaly disappears for larger groups.  A group that is 75 percent of the total population could register a cognizable disparity if it were only 67 percent of the jury pool, while a group that is 7.5 percent could never register a disparity, even if entirely absent from the pool.  I have a hard time accepting a rule that favors larger groups and ignores smaller groups altogether.

Our cases have referred to the "main alternative" to absolute disparity as "comparative disparity."  *Id.*  We rejected that approach because we thought it was unworkable with small numbers:  "[I]f Hispanics are 2% of the community and 1% of the jury pool, the comparative disparity is 50%, but for every 100 jurors, there is only one fewer Hispanic than would be proportional."  *Id.*; *see also United States* v. *Sanchez-Lopez*, 879 F.2d 541, 547–48 (9th Cir. 1989).  But we're not dealing here with a hundred people; we're dealing with a jury pool of over 40,000.  For a group that size, there are statistical methods that can easily tell us whether a sub-group that is 5.2 percent of the population (blacks in the Southern District) is underrepresented if it makes up only 3.5 percent of the jury pool.

In the equal protection context, the Supreme Court has used "standard deviation analysis," *see, e.g.*, *Castaneda* v. *Partida*, 430 U.S. 482, 496 n.17 (1977), which "seeks to determine the probability that the disparity between a group's jury-eligible population and the group's percentage in the qualified jury pool is attributable to random chance," *Berghuis* v. *Smith*, 130 S. Ct. 1382, 1390 n.1 (2010).  More

than two or three standard deviations means that "the hypothesis that the jury drawing was random would be suspect to a social scientist." *Castaneda*, 430 U.S. at 496 n.17. Doing some quick math, I calculate that the disparity between 5.2 percent and 3.5 percent in this case is more than 14 standard deviations. *See id.* (detailing the formula). So there's cause to worry.

I'm not sure whether standard deviation analysis is appropriate here, but I suspect that a statistician would laugh at our current methodology. As a three-judge panel, we're not free to depart from *Rodriguez-Lara*, but an en banc court could, and perhaps should, take a fresh look at the issue.